**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| KENYATTA LOUISE SADDI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-01447-TWP-MG |
| | ) | |
| ENVOY AIR, INCORPORATED, | ) | |
| RACHEL ALANIZ-CARMICHAEL Regional | ) | |
| Managing Director, | ) | |
| CLAUDIA ARMAS Lead Customer Operations | ) | |
| Agent, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PENDING MOTIONS AND**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendants Rachel Alaniz-Carmichael ("Alaniz-Carmichael"), Claudia Armas ("Armas"), and Envoy Air, Inc.'s ("Envoy") (collectively referred to as the "Defendants") Motions to Dismiss (Dkt. 24, Dkt. 39) and Motion for Summary Judgment (Dkt. 45). *Pro se* Plaintiff Kenyatta Louise Saddi ("Saddi") brought a variety of claims, including disability discrimination and retaliation under the Americans With Disabilities Act ("ADA"), hostile work environment under Title VII, wrongful termination, intentional infliction of emotional distress, and negligence, alleging that the Defendants interfered with her access to care during a medical emergency. The first Motion to Dismiss (Dkt. 24), **denied as moot.** Because Saddi's Second Amended Complaint (Dkt. 36; Dkt. 37) complies only in part with the Order granting her leave to file a Second Amended Complaint (Dkt. 35), Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (Dkt. 39) is **granted in part and denied in part**. For the reasons explained in this Order,  Defendants' Motion for Summary Judgement (Dkt. 45) is **granted.**

## I.    <u>BACKGROUND</u>

When reviewing a motion to dismiss, the Court accepts as true all factual allegations in the Amended Complaint and draws all inferences in favor of Plaintiffs as the non-moving party. *See Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008). When reviewing a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).  Because she is self-represented, the Court also liberally construes Saddi's Second Amended Complaint and holds it to a less stringent standard than formal pleadings drafted by lawyers.  See *Obriecht v. Raemisch*, 517 F.3d 489, 491 n.2 (7th Cir. 2008).

A.  Factual Background

Defendant Envoy is a wholly-owned subsidiary of Envoy Aviation Group Inc., which in turn is a wholly-owned subsidiary of American Airlines Group Inc. (Dkt. 29). Defendant Alaniz-Carmichael is an employee of Envoy who served as a Regional Managing Director responsible for Envoy operations at their station in Indianapolis, Indiana, where Saddi was employed, and Defendant Armas is an employee of Envoy who served as a team lead and a superior employee to Saddi during her employment. *Id*.

Saddi was hired by Envoy on May 13, 2024, as a part-time Cabin Appearance Agent (Dkt. 36 at 1). Her work duties included preparing the interior of aircraft for departure and stocking aircraft with appropriate supplies. *Id*. In her employment application, Saddi responded, "Yes, with a disability (or previously had  disability)," to the inquiry concerning disability, under "Veteran Status and Definitions"  (Dkt. 54-1 at 4-5).

Like all employees, Saddi was required to abide by Envoy's policies and applicable safety and transportation regulations including Envoy's policy that new hires were "probationary

employees" for the first six months of employment which requires that their attendance be tracked using a point system (Dkt. 45-2 at 1). During an employee's probationary period, Envoy will issue a warning letter if the employee has earned 2.5 or more attendance points, and earning 3.5 or more attendance points is grounds for immediate termination (Dkt. 45-1 at 2). Saddi signed and confirmed receipt of the probationary employee leave policy on May 1, 2024 (Dkt. 54-1 at 19).

In June 2024, Saddi was exposed to fish being warmed up in the cabin agent break room which resulted in her having hives and triggered her asthma (Dkt. 54 at 10). Afterwards, Saddi emailed Armas and explained that she was "severely allergic to it" and that she had taken some medication (Dkt. 54-1 at 10). Saddi further told Armas that she could "get a letter put in through HR from my allergy doctor to further explain my situation." *Id*. However, no other communication between Saddi and management occurred concerning Saddi's fish allergy. Saddi alleges that she continued to have to work in an environment with the smell of fish which caused her flare-ups and asthma (Dkt 36 *Id*. at 5). Due to these flare-ups, Saddi had to call in sick and be tardy at work leading to accumulated attendance points. *Id*.

On July 22, 2024, Saddi had another allergic reaction and verbally told Armas that she needed a flight home in the middle of a scheduled double shift (Dkt. 45-2 at 2). Armas was aware that Saddi had already accumulated 2.5 attendance points and thus advised Saddi to find another employee to cover her shift, which Saddi did. *Id*. Armas then requested that Saddi's direct supervisor, Brian Ginn, provide Saddi with a Performance Discussion Record to make Saddi aware of her performance points. *Id*. at 3. The Performance Discussion Record informed Saddi "as of 7/22/2024, you currently have 2.5 points. Per our attendance policy, you can only accumulate up to 3 points on probation. This is a documented discussion regarding your attendance for you to be

3

aware of where you stand." *Id*. at 4. Saddi admits that she received the Performance Discussion Record, but she refused to sign it (Dkt. 36 at 6).

Saddi's claims arise following a medical emergency that occurred on October 11, 2024. Saddi also has a peanut allergy and accidentally consumed some M&M's candy containing peanut butter. *Id*. The Second Amended Complaint alleges that as Saddi was walking up the steps to board the aircraft she was scheduled to work on, she began having an asthma attack. *Id*. Saddi told her Crew Chief who said that she should call 9-1-1. Saddi responded that an emergency call was not needed, and she instead needed to grab her inhaler. *Id*. at 6. Saddi then ran into Armas's office to explain that she was experiencing an allergic reaction, she began sweating profusely and unsuccessfully attempted to administer her EpiPen before passing out. *Id*. Saddi remembers Alaniz-Carmichael badgering her and telling Alaniz-Carmichael that Saddi was having an allergic reaction to peanuts and going into anaphylactic shock, so she needed Alaniz-Carmichael to call 9-1-1. Saddi remembers Alaniz-Carmichael commenting that Saddi said she was allergic to fish and now was saying she's allergic to peanut butter, so they are refusing to call 9-1-1 but will offer water and a chair and Alaniz-Carmichael will come check on her every five minutes. *Id*. at 8. Saddi then passed out for three to four minutes before waking up and hiding from Alaniz-Carmichael, because she believed Alaniz-Carmichael was trying to kill her. *Id*.

Armas avers that Alaniz-Carmichael came to her office and stated that Saddi may be having an allergic reaction to peanuts and asked her to call 9-1-1 (Dkt. 45-2 at 3). Armas promptly called 9-1-1 and informed emergency responders that there was someone at the Indianapolis International Airport having an allergic reaction and gave the gate information on where she understood Saddi was located. *Id*. However, while Armas was still on the phone with emergency personnel, she was advised to cancel any medical assistance because Saddi "didn't need it." *Id*. Armas then concluded

the call. Saddi's coworkers agreed to take over Saddi's duties for the rest of her shift. Saddi subsequently traded all her shifts until October 24, 2024. *Id*. at 9.

When Saddi arrived for work on October 24, 2024, she was told to go to the manager's office. Alaniz-Carmichael delivered Saddi a letter informing her that she had been terminated pursuant to Envoy's probationary employee policy (Dkt. 45-2 at 3). The termination letter stated that Saddi received four points on August 10, 2024, and the fifth point on September 14, 2024, and explained that the limit for probationary employees was 3.5 points (Dkt. 45-6 at 1). Saddi refused to sign the termination notice because it was from Alaniz-Carmichael (Dkt. 36 at 9).

After her termination, Saddi emailed Alaniz-Carmichael and asked if she was aware of her disability (Dkt. 54 at 3). Alaniz-Carmichael responded that she "was not made aware of any medical condition; other than the one incident where you thought you were having a reaction to some candy you purchased." (Dkt. 54-1 at 20). Saddi then sent the Defendants an undated "letter of disability" from the state of Michigan Department of Health that simply stated that Saddi is an individual with a documented disability. *Id*. at 22.

Saddi contends that she never told Armas that she did not need medical attention on October 11, 2024, rather, it was Alaniz-Carmichael impersonating Saddi to throw off and deceive the dispatcher to not send help (Dkt. 53 at 3). Saddi believes this was done in an attempt to cause her death. *Id*. Saddi later obtained the 9-1-1 call. The call confirms Defendants' version of what happened (*See* Dkt. 45-5, audio recording of 9-1-1 call placed by Armas on October 11, 2024).

In addition to the incidents concerning Saddi's alleged disabilities, Saddi was the focus of sexual rumors started by a male coworker (Dkt. 53 at 21). The rumors included that Saddi was "having a sexual affair" with a male coworker despite Saddi being married. Saddi's coworker

5

Darlene Hammand expressed frustrations to Saddi about the rumors. *Id*. Saddi sent a cease and desist letter to the male coworker on September 6, 2024. *Id*. at 22; (*See* Dkt. 54-1 at 15).

In her Second Amended Complaint, Saddi brings claims that Envoy discriminated against her, wrongfully terminated her, and caused a hostile working environment against her under the ADA and Title VII of the Civil Rights Act of 1964. (Dkt. 36 at 16). She also raises negligence claims against Alaniz-Carmichael and Armas, alleging that they breached their duty of care and inflicted severe emotional distress and anxiety on her. *Id*.

### B. Procedural Background

Saddi initiated this action on July 20, 2025, (Dkt. 1), and filed an Amended Complaint on October 2, 2025 (Dkt. 18). On October 31, 2025, Saddi filed a Motion for Leave to Amend Complaint (Dkt. 31). Defendants Rachel Alaniz-Carmichael, Claudia Armas, Envoy Air, Incorporated, and Kevin Ward filed a Response in Opposition to Plaintiff's Motion, (Dkt. 33), to which Plaintiff did not reply. The Magistrate Judge granted Saddi's motion to the extent that "she may file the Proposed [Second] Amended Complaint, (Dkt. 31-1), attached to her Motion, with the following change: she may raise a negligence claim against Defendants Armas and Alaniz-Carmichael only." (Dkt. 35). On January 20, 2026, Saddi filed a Second Amended Complaint, (Dkt. 36), and the next day, filed a duplicate Second Amended Complaint (Dkt. 37). Defendants promptly filed a Motion to Dismiss Plaintiff's Second Amended Complaints (Dkt. 39).

## II.    LEGAL STANDARDS

### A. Dismissal for Failure to Comply with a Court Order

Under Federal Rule of Civil Procedure 41(b), "[i]f the plaintiff fails to prosecute or comply with these rules or a court order," her claims may be dismissed with prejudice. "A district court has the authority under Federal Rule of Civil Procedure 41(b) to enter a sua sponte order of

dismissal for lack of prosecution." *James v. McDonald's Corp.*, 417 F.3d 672, 681 (7th Cir. 2005). "Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule—except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19—operates as an adjudication on the merits." Fed. R. Civ. P. 41(b).

B.  Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party must inform the Court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573–74 (7th Cir. 2017).

**III.    DISCUSSION**

The Court will first discuss the motions to dismiss before turning to the motion for summary judgment.

### A.  <u>Motions to Dismiss</u>

Because Saddi's Amended Complaint was filed subsequent to the first Motion to Dismiss (Dkt. 24), the first motion to dismiss is **denied as moot.**

On January 6, 2026, the Magistrate Judge entered an Order on Motion for Leave to File Second Amended Complaint, granting Saddi leave to file a Second Amended Complaint (Dkt. 35). The notable difference between the proposed complaint and the First Amended Complaint, (Dkt. 18), was Saddi's "inclusion of claims for 'breach of duty, intentional negligence, [and] gross negligence,' in addition to her employment discrimination and retaliation claims." (Dkt. 35 at 1). Noting that there are no degrees of negligence in Indiana, the Magistrate Judge construed the proposed Second Amended Complaint as adding a claim for negligence against Defendants Kevin Ward, Rachel Alaniz-Carmichael, and Claudia Armas, therefore the negligence claim against Kevin Ward would be futile. *Id*. at 2-3. Accordingly, Saddi was granted leave with the instruction that she "may raise a negligence claim against Armas and Alaniz-Carmichael *only*." *Id*. at 4 (emphasis in original). She was given until January 21, 2026, to file her Second Amended Complaint and ordered to "omit the phrase 'breach of duty, intentional negligence, gross negligence' from the Second Amended Complaint that she files." *Id.* at 4 n.1.

Saddi timely filed two versions of the Second Amended Complaint. The two filings do not differ from each other, nor do they differ materially from the First Amended Complaint (*see* Dkt. 18; Dkt. 36; Dkt. 37). However, the filings ask for damages sustained from Defendants' "intentional tort negligence" and "gross negligence" which directly contravenes the Court's Order (Dkt. 36 at 17).

Defendants point out that  "[i]f the plaintiff fails to prosecute or to comply with . . . a court order, a defendant may move to dismiss the action or any claim against it. Fed. R. Civ. P. 41(b)."

(Dkt. 40 at 2). They contend that Saddi has failed to comply with the Court's Order granting leave to file her Second Amended Complaint. Accordingly, Defendants ask this Court to dismiss the Second Amended Complaint under Rule 41(b) because "each version differs in material ways from the Proposed Amended Complaint that the Court ordered her to file," and Saddi refers to "intentional tort negligence" and "gross negligence" in violation of the Court's prior Order (Dkt. 40 at 2; Dkt. 36 at 17).

To the extent that the Second Amendment Complaint refers to "intentional tort negligence" and "gross negligence", the Motion to Dismiss is **granted in part** as to those claims and they are **dismissed with prejudice**. In addition, any claim against Defendant Kevn Ward, is **dismissed**. However, the Court need not dismiss Saddi's ADA, Title VII, and remaining negligence claims that comply with the Court's Order. Accordingly, the remaining claims will be allowed to proceed, Saddi's first filed Second Amended Complaint, (Dkt. 36), will be treated as the operative pleading, and her second filed Second Amended Complaint, (Dkt. 37), will be **stricken as repetitive**. *See* Fed R. Civ. P. 12(f) (A court may, on its own or on motion by a party, strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter.").

### B. Summary Judgment

Defendants move for summary judgment contending that Saddi's remaining claims—violations of the ADA for discrimination and retaliation, violation of Title VII for a hostile work environment, wrongful termination, IIED, and negligence—fail as a matter of law (Dkt. 47). The Court will address each of Saddi's claims in turn.

### 1. ADA Discrimination

Saddi claims that Envoy discriminated against her because of her disability, which she identifies as allergic reactions to seafood and peanuts (Dkt. 36 at 1, 7). The ADA (U.S.C. § 12101

*et seq*.) prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual." *Weigel v. Target Stores*, 122 F.3d 461, 463–64 (7th Cir. 1997). "[T]he Act also prohibits an employer from failing to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Id*. at 464. Saddi alleges disparate treatment and failure to accommodate claims (Dkt. 36 at 5).

For Saddi's disparate treatment claim, she must present evidence that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside her protected class were treated more favorably. *Fields v. Board of Education*, 928 F.3d 622, 625 (7th Cir. 2018). Under the ADA, a "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). To establish that one has a disability, they must show that (1) they have a "physical or mental impairment that substantially limits one or more major life activities"; (2) that they have "a record of such an impairment"; or (3) that the employer regarded them "as having such an impairment." *Bodenstab v. County of Cook*, 569 F.3d 651, 656 (7th Cir. 2009).

Saddi argues that she has a physical disability (allergies) and mental disability, including "anxiety and depression" and that there is sufficient evidence to conclude that she was "suffering stress from her work environment caused by Defendant management when she was terrified with stress, mental anguish[,] and depression as she escaped from Defendants who were trying to allow her to be fatally harmed by not allowing her to receive 911 medical emergency services." (Dkt. 53 at 12).

Defendants argue that Saddi has failed to provide any evidence that her described conditions substantially limited her major life activities when active and the isolated incidents

10

described don't demonstrate the frequency or severity required to establish disability under the ADA (Dkt. 56 at 5). Defendants further assert that Saddi's self-reported disability status on the employment application form does not identify the nature of any disability condition and is "insufficient without corroborating medical evidence showing how her conditions actually impacted her work performance." *Id*.

The Court agrees with the Defendants. Saddi claims to have made Envoy aware of her allergy to fish in an email and in her employment application form but she did not provide a documented record of her allergy history, show that her allergies substantially limit one or more of her major life activities, or report that she is allergic to peanuts. Armas avers that she was advised that "[Saddi] suffered allergic reactions to the smell of fish and that one or multiple employees were microwaving fish in one of . . . [the] breakrooms," but states that "[Saddi] did not explain the nature of the allergy in further detail, nor the severity of her allergic reactions at that time." *Id*.

Saddi claims to have been suffering from an allergic reaction after consuming peanuts on October 11, 2024, however, she has designated no evidence to show that she was in fact having an allergic reaction or that she sought medical care. Moreover, Saddi's claim that Defendants did "not allow[] her to receive 911 medical emergency services" is contradicted by Alaniz-Carmichael's and Armas's signed declarations. Alaniz-Carmichael affirms that after Saddi told her about her alleged allergic reaction on October 11, she "asked [Saddi] if she needed anything to aid her, to which she said she did not." (Dkt. 45-1 at 2). Alaniz-Carmichael then "advised Claudia Armas that [Saddi] may be having an allergic reaction and that we might need to call 9-1-1." *Id*.  The designated evidence shows that Armas "promptly called 9-1-1 and informed emergency responders that there was someone at the Indianapolis International Airport having an allergic reaction." *Id*. Armas gave the dispatcher "appropriate gate info" on where she "understood [Saddi] was". *Id*.

When Alaniz-Carmichael returned to Saddi's last known location with a glass of water, "[Saddi] was gone." *Id*. While she was still on the phone, Armas was "advised to cancel any medical assistance for [Saddi] because she 'didn't need' it." *Id*. Armas then told the dispatcher that assistance was no longer needed and hung up the phone. *Id*.

Saddi has presented a screenshot photograph of her face with hives dated June 16, with an inquiry "what to take for my face for reaction to fish" and the response is "Allegra 120mg twice daily." (Dkt. 54-1 at 9). However she has not provided a documented record of her allergy history, nor has she provided evidence that Envoy acknowledged them as a substantial impairment that limited one or more of her life activities. For these reasons, Saddi has not shown that she qualifies as disabled under the ADA.

Saddi has also not shown that her alleged disability was the reason for her termination. In a "Performance Discussion Record" serving as a warning, Envoy stated: "Kenyatta Saddi . . . you currently have 2.5 points. Per our attendance policy you can only accumulate up to 3 points on probation. This is a documented discussion regarding your attendance for you to be aware of where you stand." (Dkt. 45-6 at 2). Saddi's termination letter also reads: "I regret to inform you that your performance during your probationary period has not met Envoy's minimum standards. Points: 5.00 . . . For this reason, it is necessary to remove you from payroll effective October 24, 2024." *Id.* at 1. These records evidence that Saddi was terminated for her unsatisfactory attendance during her probationary employment period. Saddi has not designated any evidence to show that the adverse employment action was caused by her disability and not her unsatisfactory attendance record.

Next, to succeed on a failure to accommodate claim, a plaintiff must show (1) that they are a qualified individual with a disability, (2) that the employer was aware of the disability, and (3)

that the employer failed to reasonably accommodate their disability. *Williams v. Bd. Of Educ. Of City of Chi.*, 982 F.3d 495, 503 (7th Cir. 2020). A person is a qualified individual under the ADA when, at the time of the decision to terminate, the employee is (1) meeting the employer's legitimate expectations and (2) capable of performing the jobs "essential functions" with or without reasonable accommodation from an employer. *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005) (citations omitted). The "ADA does not shelter disabled individuals . . . if the individual, for reasons unrelated to their disability . . . fails to meet their employer's expectations." *Id*.

Saddi argues that "defendant has not noted or suggest [sic] that they had any work performance issues or concerns with [Saddi,] as she was a stellar employee in successfully completing all of her job duties[,]" (Dkt. 53 at 14), and that "[d]efendant used a 'neutral' policy (attendance points) to weed out a disabled employee while rewarding non-disabled employees who didn't face the same medical hurdles, all while refusing to provide the **reasonable accommodation** that would have leveled equalized [sic] attendance point for the Plaintiff." *Id.* at 19 (emphasis in original).

Defendants argue persuasively that Saddi has failed to provide evidence that she is disabled or that she was performing her job satisfactorily (Dkt. 47 at 13). Saddi's claim fails because she has not shown that she is a qualified individual with a disability. Even if Saddi could show that her food allergies are a disability, she has not shown that she was performing her duties in accordance with Envoy's reasonable expectations, evidenced by her accumulation of attendance violation points. Although Saddi argues that she was not provided with a reasonable accommodation for her allergies, Saddi does not dispute that Armas told her "that there was a separate break room that she could use to avoid the smell of fish and suggested that she make her coworkers aware of her allergy

13

for the future." (Dkt. 45-2 at 1). Moreover, Saddi has not presented any evidence that the accumulation of the points was related to her allergies in any way. Armas testified that "Envoy has terminated 31 other employees . . . for earning 3.5 or more attendance points" and that to her knowledge, "none of those 31 employees had a disability." (Dkt. 45-1 at 3). For these reasons, Saddi's ADA discrimination claims fail, and summary judgment is **granted** in favor of the Defendants.

## 2. ADA Retaliation Claim

In her Second Amended Complaint, Saddi alleges the Defendants retaliated against her by "using Supervisor Brian Ginn as a Flying Monkey to hand deliver her a Performance Discussion Record." (Dkt. 36 at 5). The Second Amended Complaint makes no further allegations of retaliation. A prima facie retaliation claim requires the plaintiff to show: (1) they were engaged in protected activity; (2) they were subject to an adverse employment action; (3) they were performing their job satisfactorily; and (4) no similarly situated employee who refrained from protected activity suffered an adverse employment action. *Burs v. Wis. DOT*, 464 F.3d 744, 759 (7th Cir. 2006). The claim must constitute a "but for cause of the alleged adverse action by the employer." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

For the reasons stated above, Saddi's claim fails because she has not shown that she was performing her job satisfactorily. The designated evidence shows that Saddi had 5 attendance points during her probationary employment period. Even if Saddi had a documented disability, "an employer is generally permitted to treat regular attendance as an essential job requirement and need not accommodate erratic or unreliable attendance. A plaintiff whose disability prevents her from coming to work regularly cannot perform the essential functions of her job, and thus cannot be a qualified individual for ADA purposes." *Taylor-Novotny v. Health Alliance Medical Plans,*

14

*Inc.*, 772 F.3d 478, 489-90 (7th Cir. 2014). Like all employees, Saddi was required to abide by Envoy's policies, (Dkt. 45-2 at 1), and thirty-one other employees were terminated for accruing 3.5 or more attendance points (Dkt. 47 at 14). To Envoy's knowledge, none of these other employees were disabled. *Id*. For these reasons, summary judgment is **granted** on Saddi's retaliation claim

### 3. Title VII Claim for Hostile Work Environment

Saddi claims that she was subjected to a hostile work environment when unnamed employees spread rumors that she was sleeping with a male coworker.[1] She argues that these allegations made the workplace very stressful and led to discomfort in her relationship with her spouse. Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee on the basis of sex. 42 U.S.C. § 2000e-2(a)(1). An employer violates this provision when "discrimination based on sex . . . create[s] a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). A hostile work environment is one that is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." *Estate of Harris v. City of Milwaukee*, 141 F.4th 858, 867 (7th Cir. 2025) (citation omitted). A hostile work environment claim based on sexual harassment requires: (1) the plaintiff's workplace was both subjectively and objectively offensive; (2) the plaintiff's sex was the cause of the harassment; (3) the harassment was severe or pervasive; and (4) there is a basis for employer liability. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 561 (7th Cir. 2016). An offensive

---

[1] Saddi makes no such factual allegation in her Second Amended Complaint but nonetheless seeks relief under Title VII, and the parties specifically address this claim which was in Saddi's Amended Complaint (Dkt. 18 at 12), in their briefing (Dkt. 47 at 14; Dkt. 53 at 21). Technically this claim is waived, however, because the parties addressed the claim, the Court will as well.

15

workplace is "one that a reasonable person would find hostile or abusive, and one that a victim did in fact perceive to be so." *Hilt Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002).

Saddi argues that "slanderous comments targeted [her] professional reputation, caused friction within her marriage and her religious reputation as she is a delivered God-fearing minister." (Dkt. 53 at 22). The harasser used "sexual tropes and gender-based stereotypes regarding her 'moral character' and 'professionalism'." *Id*. She sent a cease-and-desist letter and asserts that Envoy failed to take remedial action. *Id*.

Defendants argue that Saddi has "provide[d] no evidence showing the frequency, severity, and pervasiveness needed to establish a hostile work environment." (Dkt. 56 at 6). They argue that Saddi provides no evidence that management participated in or endorsed the alleged rumors and that a single cease and desist letter does not establish that management was aware of ongoing harassment and failed to address it. *Id*.

Defendants are correct. Saddi has offered no evidence beyond her belief that the rumors existed, much less that their content was offensive to a reasonable person. Without more, she has failed to meet her burden of proof in showing that the alleged rumors were objectively offensive.

Further, Saddi has failed to show that the harassment was severe or pervasive. To determine this factor, courts consider "the severity of the allegedly discriminatory conduct, its frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance." *Lord*, 839 F.3d at 561. Saddi claims the rumors were "non-stop" and "ongoing", but she has not alleged the specific nature of these rumors or claimed they were humiliating or threatening.

Even if an unnamed coworker spread rumors that Saddi was sleeping with a male coworker, such rumors do not rise to the level of harassment required for liability under a hostile work

16

environment claim. "To be severe or pervasive enough to create a hostile work environment, conduct must be 'extreme'." *EEOC v. Costco Wholesale Corporation*, 903 F.3d 618, 625 (7th Cir. 2018). The Seventh Circuit has found that an employer did not severely or pervasively harass a female employee by "asking what color bra she was wearing, pulling back the shoulder strap of her tank top to see for himself, and suggesting that he 'make a house call' when she called in sick. . . [or] a coworker . . . making sexual comments and touching [female plaintiff's] arm, fingers, or buttocks, on four occasions." *Costco Wholesale*, 903 F.3d at 625 (citing *McPherson v. City of Waukegan*, 379 F.3d 430, 438–39 (7th Cir. 2004); *Adusumilli v. City of Chicago*, 164 F.3d 353, 361–62 (7th Cir. 2004)). The rumors Saddi is alleging do not rise to the level of severity required for a Title VII hostile work environment claim.

Finally, there is no basis for employer liability. If the harasser is a supervisor, the employer is strictly liable unless the employer shows that (1) no tangible adverse employment action was taken against the plaintiff; (2) the employer exercised reasonable care to prevent and promptly correct the harassing behavior; and (3) the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to otherwise avoid harm. *See Estate of Harris*, 141 F. 4th at 866–67.

Saddi has not alleged that her supervisors were responsible for the rumors. Saddi was presented with a termination letter by Alaniz-Carmichael for not meeting the minimum attendance policy standard. While the termination constitutes a tangible employment action, the supervisor/harasser must have taken the action as part of the harassment for liability under Title VII. *Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003). Saddi does not contend that the termination was mere pretext as part of Alaniz-Carmichael's or any other superior's plan to spread sexual rumors about her.

17

In addition, Envoy designated evidence to show that it exercises reasonable care to prevent and correct harassment when it becomes aware of its occurrence. Envoy's "Culture of Respect" policy explicitly outlines Envoy's commitment to create an environment free from unlawful and sexual harassment (Dkt. 45-3 at 34). The introduction states that upon an employee's start date, they are required to complete additional training to learn more about the policy and then provided with further resources to solidify the employee's understanding of their role in upholding the policy and how Envoy enforces it. In determining whether the employer was exercising reasonable care, the Seventh Circuit has held that the existence of an appropriate anti-harassment policy will often satisfy the requirement. *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999).

Saddi failed to take advantage of preventative or corrective opportunities by not reporting or notifying her supervisors or HR at Envoy that these rumors were being spread. If the harasser is a coworker, "the employer is liable only if it was negligent in controlling working conditions." *Estate of Harris*, 141 F.4th at 867 (citation omitted). An employer is not liable "when a mechanism to report the harassment exists, but the victim fails to utilize it." *Trahanas v. Northwestern University*, 64 F.4th 842, 855 (7th Cir. 2023). Envoy's "Culture of Respect" policy provides a "defined process to report harassment" that Saddi was advised of in the online lesson on the first day of her employment (Dkt. 45-3 at 34). Saddi did not report or otherwise alert Envoy that the rumors were being spread, and Armas testified she had no knowledge of the rumors at any point during Saddi's employment (Dkt. 45-2). Because Saddi failed to utilize any established mechanisms to report harassment, Envoy exercised reasonable care, and no tangible employment actions were taken as part of the harassment, there is no basis for employer liability utilizing a supervisor-led or coworker-led harassment theory under Title VII, summary judgment is **granted.**

18

### 4.  Saddi's Wrongful Termination Claim

Saddi alleges that her dismissal from Envoy constituted a wrongful termination (Dkt. 36 at 9). Indiana follows the at-will employment doctrine and permits both the employer and employee to terminate the employment at any time for a "good reason, bad reason, or no reason at all." *Montgomery v. Board of Trustees of Purdue University*, 849 N.E.2d 1120, 1128 (Ind. 2006). Indiana recognizes a narrow public policy exception when an employee has been fired for exercising a statutory right or for refusing to violate the law. *Cantrell v. Morris*, 849 N.E.2d 488, 494 (Ind. 2006).

Saddi argues that her faulty attendance record was mere pretext for a firing in violation of Title VII (Dkt. 53 at 23). As evidence, she states that ". . . two years prior to plaintiff's probationary period, there were 31 non-disabled probationary employees terminated due to 3.5 or more attendance points[.] [A]ll other probationary employees except [Saddi], were promoted to permanent, regular employment with Defendant Envoy." *Id*. She also alleges that the timing of her termination on October 24, 2024, was immediately upon her return to work from the incident on October 11. *Id*. at 26. She argues the attendance policy acted as a barrier only for her.

Defendants argue that Saddi was fired for accruing excessive attendance points in violation of company policy and cannot show that her termination for violation of the attendance policy was pretext for a wrongful termination (Dkt. 56 at 7). The designated evidence supports that Saddi was fired for accumulating attendance points pursuant to Envoy's probationary employee policy, which she reviewed and signed. She was not fired for exercising a statutory right or refusing to violate the law. As such, her wrongful termination claim fails, and summary judgment is **granted** in favor of the Defendants.

19

**5.   Saddi's claim for Intentional Infliction of Emotional Distress ("IIED")**

Saddi raises an IIED claim, (Dkt. 36 at 16), alleging that she suffered emotional distress due to the conduct of Defendants when the 9-1-1 call was cancelled with the intent to cause her death. *Id*. at 13. An IIED claim requires that the plaintiff show that the defendant "(1) engage[d] in extreme and outrageous conduct (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another." *Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 549 (Ind. Ct. App. 2015).

[IIED] cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" *Bradley v. Hall*, 720 N.E.2d 747, 753 (Ind. Ct. App. 1999).

Saddi claims that Defendants' conduct "demonstrat[es] reckless disregard for human life that goes beyond all possible bounds of decency through a deliberate attempt to cause her death." (Dkt. 53 at 30). Defendants argue that the evidence shows that they initially called 9-1-1, "demonstrat[ing] their concern for [Saddi's] well-being, not an intent to cause distress (Dkt. 56 at 8). Further, they argue that the decision to cancel emergency services does not rise to the level of outrageousness required for an IIED claim, especially because they believed the call was cancelled

20

due to Saddi's own representations. *Id*. Defendants contend, "[a]t most, this lawsuit represents a disagreement about appropriate medical response, not the kind of extreme and outrageous conduct that is 'utterly intolerable in a civilized community.'" *Id*.

Based on the record, Defendants' conduct does not rise to the level of malice or aggravation for a successful IIED claim. Saddi has not produced any evidence that the Defendants encouraged the 9-1-1 operator not to send assistance as part of a calculated conspiracy to cause her untimely death. Moreover, the Defendants submitted uncontradicted evidence showing that they cancelled the 9-1-1 call because Saddi had left and no longer needed medical attention (Dkt. 45-1 at 3; Dkt. 45-2 at 3). Thus, summary judgment is **granted** in favor of Defendants on Saddi's IIED claim.

### 6. **Saddi's Negligence Claim.**

Saddi asserts negligence claims against Armas and Alaniz-Carmichael for cancelling the 9-1-1 call after she experienced an allergic reaction. "The elements of negligence are duty, breach of duty, and damages proximately caused by the breach." *Force v. New China Hy Buffet LLC*, 217 N.E.3d 1275, 1278 (Ind. Ct. App. 2023).

Under *Ebbinghouse v. FirstFleet, Inc.*, an employer has a duty to use reasonable care to provide its employees with a reasonably safe work environment. 693 N.E.2d 644, 647, n.3 (Ind. Ct. App. 1998). However, in Indiana, one generally has no legal obligation to go to the aid of a victim in peril unless a duty arises from a special relationship between the parties. *Stockberger v. U.S.*, 225 F.Supp.2d 949, 960 (S.D. Ind 2002). In *Stockberger*, the court held that an employer had no duty to give or arrange medical assistance to an employee when they became ill at work. *Id*. Because there was not a special relationship between the parties, the employer had no affirmative duty to act. *Id.*

However, an actor who begins to render aid to another and knows that such aid will reduce the risk of physical harm has a duty of reasonable care to the other in conducting the undertaking if (a) the failure to exercise such care increases the risk of harm beyond that which existed without the undertaking, or (b) the person to whom the services are rendered or another relies on the actor's exercising reasonable care in the undertaking. *Yost v. Wabash College*, 3 N.E.3d 509, 517 (Ind. 2014). For the purposes of this Motion only, Alaniz-Carmichael and Armas do not dispute that they made efforts to render services to Saddi and therefore had a duty of reasonable care towards her. Defendants, however, contend that they did not breach their duty and the Court agrees.

Without having a duty to do so, Defendants complied with Saddi's request to call 9-1-1. In addition, while they told the dispatcher to cancel medical services, they did so only after Saddi appeared to advise them that medical services were not needed. In her response to Alaniz-Carmichael's declaration, Saddi herself admits that she "yelled 'RACHEL!'", walked toward her and said, "I survived I am going to be okay" because "the most High God gave her spiritual discernment." (Dkt. 51 at 3). This statement discharged Defendants from any further potential duty towards Saddi, meaning they could not have breached their duty at any point afterwards. Because Defendants did everything that Saddi asked of them, they could not have breached their duty toward her.

In addition, even if a duty has been breached, the Indiana Good Samaritan Law provides that:

> A person who comes upon the scene of an emergency or accident . . . or is summoned to the scene of an emergency or accident and, in good faith, gratuitously renders emergency are at the scene of the emergency or accident is immune from civil liability for any personal injury that results from: (1) any act or omission by the person in rendering the emergency care; or (2) any act or failure to act to provide or arrange for further medical treatment or care for the injured person except for acts or omissions amounting to gross negligence or willful or wanton misconduct.

22

Ind. Code § 34–30–12–1(b). Because Defendants did not otherwise have a duty to provide care to Saddi and only assumed a duty once they began rendering emergency care, they are contemplated and protected by the Indiana Good Samaritan Law.

Saddi also fails to show that the Defendants' conduct caused her any quantifiable damages. An essential element in a negligence action is the requirement of a reasonable connection between a defendant's conduct and the damages which a plaintiff has suffered. *Foddrill v. Crane*, 894 N.E.2d 1070, 1077 (Ind. Ct. App. 2008). Saddi does not put forward any facts or evidence that show that any concrete damages resulted from defendants cancelling the 9-1-1 call. It is not alleged that she sought any medical aid after her allergic reaction, nor that she incurred any medical bills because of the incident. She argues that she "traded all her shifts until October 24, 2024" because she was "having anxiety and was anxious about returning to work," (Dkt. 36 at 9), but she must have suffered a "direct physical impact" from Defendants' conduct. *Conder v. Wood*, 716, N.E.2d 432, 434 (Ind. 1999). No such impact took place here, and Saddi cannot show that Defendants' conduct caused her to suffer any actual damages. Accordingly, her negligence claim fails, Court summary judgment is granted on her negligence claims.

## IV.    CONCLUSION

Because the Second Amended Complaint was filed subsequent to the Motion to Dismiss the Amended Complaint, the first Motion to Dismiss, Dkt. [24], is **DENIED AS MOOT.** Because Saddi's Second Amended Complaint (Dkt. 36) failed to comply with portions of  the Order on Motion for Leave to File Second Amended Complaint (Dkt. 35), Defendants' Motion to Dismiss the Second Amended Complaint Dkt. [39] is **GRANTED IN PART and DENIED IN PART.**

The repetitive Second Amended Complaint (Dkt. 37) is **STRICKEN**.

For the reasons discussed above, Defendants' Motion for Summary Judgment Dkt. [45] is

**GRANTED.**  Final Judgment shall issue separately.

**SO ORDERED**.

Date:  7/17/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

KENYATTA LOUISE SADDI
202 Steeples Blvd.
Apt. 407
Indianapolis, IN 46222

Brent R. Borg
CHURCH CHURCH HITTLE & ANTRIM (Fishers)
bborg@cchalaw.com

Samuel Jackson Calderone
Church Church Hittle & Antrim
scalderone@cchalaw.com